# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

(To be supplied by the court)

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
*11:56 am, Oct 13, 2023*
**JEFFREY P. COLWELL, CLERK**

Thomas David Kehoe, Plaintiff

v.

National Science Foundation, Defendant

No jury trial is requested.

## COMPLAINT

### A. PLAINTIFF INFORMATION

Thomas David Kehoe, *pro se*
720 31st St.
Boulder, CO 80303-2402
(720) 217-6589
kehoe@casafuturatech.com

### B. DEFENDANT INFORMATION

National Science Foundation
2415 Eisenhower Avenue
Alexandria, VA 22314
(703) 292-5111
info@nsf.gov

The National Science Foundation is an independent Federal agency.

### C. JURISDICTION

The U.S. District Court for the District of Colorado has statutory authority pursuant to 28 U.S.C. § 1332. This complaint deals with federal law or statute, the defendant is a federal agency, the plaintiff and defendant are in different states, and the amount in dispute is over $75,000.

The plaintiff contends under the Administrative Procedure Act 5 U.S.C. § 555 that the NSF is subject to judicial review and that this complaint has standing under the APA.

Plaintiff is a citizen of the State of Colorado.

Defendant is a federal agency located principally in the State of Virginia.

*Administrative Remedies Exhausted*

This complaint was submitted twice to the NSF Office of the Inspector General. The OIG is an independent and objective oversight authority whose mandate includes investigating NSF staff misconduct and mismanagement. The OIG is also mandated to make recommendations to improve effectiveness, efficiency, and economy of the NSF.

The OIG declined to investigate the complaint but instead referred the first submission to Ben Schrag, SBIR/STTR Program Director and Policy Liaison, who referred the complaint to Rajesh Mehta, a SBIR senior program director. Program directors are not responsible for investigating complaints about NSF staff misconduct or non-compliance with solicitations and policies.

The OIG declined to review a second, revised submission.

The plaintiff has discussed this complaint with several NSF staff members:

- Rajesh Mehta, Program Director.
- Ben Schrag, Program Director.
- Alex Tang, Assistant General Counsel.

**D. STATEMENT OF CLAIMS**

This Administrative Complaint alleges National Science Foundation (NSF) staff misconduct and non-compliance with solicitations and policies for Small Business Innovation Research[*] (SBIR) grant proposals.

Specifically, the complaint alleges that the agency failed to follow its own rules in choosing reviewers. NSF program directors selected reviewers who lacked expertise in the fields of the plaintiff's proposals. Reviews were vague, confused, inconsistent, and lacked actionable items. Reviewers showed ignorance of solicitations and policies.

---

[*] The NSF awards approximately four hundred SBIR grants annually, with an average award of $500,000, or $200 million of the NSF's $10 billion budget. Typically one in three SBIR proposals is funded.

2

This complaint does not allege that reviewers gave low scores when they should have given high scores, but rather that reviewers were not qualified to understand the proposals.

This complaint does not suggest that NSF staff targeted the plaintiff but rather that the proposal review process is flawed. This complaint suggests reforms to make the proposal review process compliant with solicitations and policies.

### *NSF Solicitations and Policies*

*Small Business Innovation and Research (SBIR) Program Solicitation NSF 23-515*

*VI. NSF Proposal Processing and Review Procedures*

"All proposals are carefully reviewed by...three to ten other persons outside NSF...who are experts in the particular fields represented by the proposal."

https://www.nsf.gov/pubs/2023/nsf23515/nsf23515.htm

*SBIR Review Process*

"All proposals are carefully reviewed by a minimum of three experts in the particular fields represented by the proposal."

https://seedfund.nsf.gov/resources/review/review-process/

*Proposal & Award Policies & Procedures*

*Chapter III - NSF Proposal Processing and Review*

*B. Selection of Reviewers*

"The NSF guidelines for the selection of reviewers are designed to ensure selection of experts who can give Program Officers the proper information needed to make a recommendation in accordance with the NSB-approved criteria for selection of projects. Optimally, reviewers should have:

"1. Special knowledge of the science and engineering subfields involved in the proposals to be reviewed to evaluate competence, intellectual merit, and utility of the proposed activity."

https://www.nsf.gov/pubs/policydocs/pappg22_1/pappg_3.jsp#IIIA2

### *NSF Review Panels*

The SBIR review process begins with a program director gathering approximately eight

proposals submitted in a single subtopic, for example, Agricultural Technology. One proposal might be about soil, another about plants, another about weeds, another about fertilizer effluent washing into rivers, etc. (These examples come from Dr. Mehta, a chemist with expertise in agriculture.)

The program director uses the keywords from this collection of proposals to search a database of reviewers. The plaintiff examined this database and saw that the reviewers are almost entirely from academia. Many reviewers are retired. In contrast, the plaintiff was told by a SBIR grant-writing consultant that one letter of recommendation (three letters are required in an SBIR application) from a potential customer is worth one hundred letters of recommendation from academics. The SBIR program is for small businesses to conduct scientific research and develop commercial products. The program is not for university research. This database is used for all NSF programs and may not be appropriate for the SBIR program.

A dozen or so reviewers are contacted and invited to join a panel. Typically, 25-30% of potential reviewers contacted agree to join the panel. Panels usually consist of three or four reviewers.

Reviewers are asked to rate their "comfort level" of expertise with each proposal, on a four-point scale. Program directors try to convene panels with many reviewers who are "comfortable" with many of the proposals. However, constraints sometimes make this impossible.

If a keyword search fails to find qualified reviewers for a proposal, the program director falls back on the subtopic to group the proposal with other proposals in the subtopic. The program directors could instead fall back on the suggested reviewers (*this is the crux of the complaint, more on this below*).

The panels meet for a day to discuss the proposals. Some panels meet remotely while others meet in-person. Remote panelists earn $200 per day. In-person, local panelists earn $280 per day. In-person panelists who must travel earn $480 per day plus travel expenses. This pay is recognized to be below competitive rates, i.e., reviewers are expected to work altruistically.

Panelists are expected to have general knowledge of the fields of the proposals or the subtopic. Deep expertise in any field is not required. A potential reviewer who has deep

4

knowledge of one field of one proposal but lacks general knowledge of the fields of all the proposals will not be invited.

This panel design is used to encourage panelists to talk to each other. If one panelist has a question, another panelist may be able to answer the question. It is not unusual for reviewers' minds to be changed during these discussions.

The panelists write individual reviews of each proposal and additionally a group review is written.

There is no guaranty that anyone on a panel will have expertise in the particular fields of any proposal. In other words, the NSF does not follow its own rules in choosing reviewers. This complaint alleges a systemic lack of compliance, not just a lack of compliance in reviewing the plaintiff's proposals.

In addition to review panels, the NSF also uses "ad hoc" reviewers. These are individual reviewers who work alone and are selected for having deep knowledge of a proposal's fields.

The NSF has no appeals process when an applicant suspects something is wrong with a proposal's reviews.

### *Expertise in the Particular Fields of the Proposals*

Solicitations specify that each proposal will be reviewed by "experts in the particular fields represented by the proposal."

*Particular* is defined as[†]

- "distinctive among other examples or cases of the same general category: notably unusual (*suffered from measles of a particular severity*)"
- "a specific item or detail of information or news (*bill of particulars*)"

The plaintiff highlights the concepts of *specific*, *distinctive*, and *unusual* in these definitions.

NSF policy specifying that reviewers have "special knowledge of the science and engineering subfields" supports this interpretation.

NSF SBIR proposals start with a "Project Summary" which has a "Keywords" section. The keywords of proposal 2322005 (March 2023) were *speech perception*, *pronunciation*,

---

[†] Merriam Webster's Collegiate Dictionary, Tenth Edition

5

*auditory processing disorders*, and *second-language acquisition*.

In addition, each proposal is submitted under a subtopic. Proposal 2322005 was submitted in the *Learning and Cognition Technologies, Neuroscience-Based* (LC8) subtopic.

The plaintiff contends that the review panels do not guaranty that a proposal will be reviewed by experts in the particular fields of the proposal. When no reviewers are found who have expertise in a proposal's keywords, falling back to the subtopic gets reviewers with general knowledge, not special knowledge or particular expertise.

The plaintiff asked Dr. Mehta for the keywords that program directors used to constitute the panels that reviewed each of his proposals. This information would indicate how broad or narrow the expertise of each panel was. The set of keywords is created before reviewers are contacted so no private information about reviewers was requested.

The plaintiff also asked Dr. Mehta for the "comfort level" each reviewer noted. This information would indicate each reviewer's expertise in the particular fields of the proposal. This information is part of the review, not part of a reviewer's private information.

The plaintiff also asked Dr. Mehta for a correlation between "comfort level" and review scores for a large sample size of proposals. This information will indicate whether the playing field is level or if reviewers who lack expertise give lower scores.

Dr. Mehta declined to provide any of this information.

### *Reviewer Expertise is Private Information*

NSF staff cite the Privacy Act and *Henke v. Department of Commerce et al.*, 83 F.3d 1445[‡] to justify not revealing reviewers' expertise to applicants. The NSF argues that, while expertise isn't discussed in *Henke*, by extension expertise cannot be revealed because expertise might identify a reviewer.

The plaintiff alleges that the NSF uses the Privacy Act and the *Henke* decision to obscure non-compliant review procedures and staff misconduct. The NSF review process lacks transparency. When the plaintiff asked program directors about reviewer expertise, NSF counsel told the program directors not to answer the plaintiff's questions.

5 U.S.C. § 552a(b) lists twelve conditions in which the federal government may disclose

---

[‡] D.C. Cir. 1996; https://www.nsf.gov/news/news_summ.jsp?cntn_id=100876.

private information about individuals. The eleventh condition, 5 U.S.C. § 552a(b)(11), is that a judge may issue a court order to a federal agency to reveal private information. This complaint requests such a court order (see below).

### *Reviewers Unaware of Expertise Requirements*

The plaintiff reviewed the training materials for reviewers linked to the webpage "Seeking Technical and Commercial Experts in Technology Commercialization and Translation":

https://seedfund.nsf.gov/resources/review/

and the video "The Art and Science of Reviewing Proposals":

https://tipsforreviewers.nsf.gov/

The plaintiff did not find instructions telling reviewers to refuse to review a proposal if they lack expertise in the particular fields of the proposal.

### *Reviews Show Reviewers' Expertise, or Lack Thereof*

The following prima facia evidence is not intended to prove that reviewers were unqualified but rather to raise doubt as to reviewers' qualifications and to justify an investigation.

The reviews reveal several patterns belying lack of special knowledge or expertise in the particular fields of the proposals.

- *Spot the mystery rule*. Several reviews rejected proposals due to non-existent NSF policies. Such non-existent policies include that SBIR grants cannot fund research, that proposals in which proof-of-concept work has been done cannot be funded, that proposals without proof-of-concept work cannot be funded, and that experimental proof of effectiveness is required. These reviews show that NSF reviewers are misinformed and poorly trained regarding solicitations and policies.
- *TLDR*. Several reviews show no evidence that the reviewer read the proposal beyond the first paragraph. This is often combined with "spot the mystery rule," i.e., the reviewer read the first paragraph, spotted a mystery rule, and rejected the proposal without reading further.
- *Expertise expired*. These reviews show knowledge of a field of a proposal, circa 1973. If a reviewer is not current in a field, they're not an expert.
- *Special ignorance of the science and engineering subfields*. These reviews contain

gems belying ignorance of the fields of the proposals. Examples include that memorizing useful phrases is an effective way to become fluent in a language, that Chinese is written with an alphabet, that Arabic is written with pictures, and confusing references to published research with what the project proposes to do, specifically, confusing brain imaging research with believing that the proposed app would scan users' brains.

No reviews discuss or show expertise in neuroscience-based learning and cognition technologies. This suggests that constitution of the review panels fell back beyond the subtopic to an even wider net.

No reviews discuss the commercialization plan. This suggests that none of the reviewers had expertise in small business management and that the NSF database of reviewers is not appropriate for the SBIR program.

### *Are Scores Random?*

One would expect to see scores progressively higher each year as a proposal improves. Ideally, reviews would point out weaknesses in a proposal and the plaintiff would correct these weaknesses. However, no progression is seen in the average scores.




*Figure 1: Expected average review scores*



*Figure 2: Actual average review scores*

These scores appear to be random. Getting funded appears to be a slot machine in which getting three reviewers who read and understand your proposal wins.

### *Suggested Reviewers*

Solicitations include a section for suggested reviewers outside the NSF. Dr. Mehta told the

8

plaintiff that suggested reviewers are rarely consulted.

In proposal 2322005 (March 2023) the Suggested Reviewers section listed two federal agencies (the Department of Defense's Defense Language Institute and the Department of State's Voice of America Learn English program), an academic organization (Pronunciation for Second Language Learning and Teaching), and a potential customer (Khan Academy).

Dr. Mehta referred the plaintiff to Carol Bessel (Section Head). The plaintiff sent an email to Ms. Bessel with the following suggestions for improving the reviews process.

The plaintiff suggested falling back on the suggested reviewers instead of the subtopic when a program director is unable to find qualified reviewers. This would ensure that every proposal is reviewed by experts in the particular fields of the proposal. In contrast, falling back to the subtopic finds reviewers who have only limited expertise ("conversational knowledge," to use Dr. Mehta's phrase) or no expertise at all.

Solicitations could ask applicants to check boxes to indicate whether each suggested reviewer is a potential grant provider, investor, or customer. Such a review would be worth one hundred reviews from academics.

It has been the plaintiff's experience that it is difficult for a small, unknown startup to connect with large organizations. The plaintiff presumes that a call from the NSF is more likely to be returned, especially if the call is to a federal agency or to an organization such as Khan Academy that is interested in science. A call from a program director could "open doors" for the applicant, leading to a grant, an investment, or an order. Thus, even a declined review may benefit an applicant.

It may take more time for program directors to contact suggested reviewers but if even one in one hundred suggested reviewers provides a grant, an investment, or an order then this suggested reform would pay for itself with reduced NSF spending.

Carol Bessel did not respond to the plaintiff's suggestions.

### *Administrative Procedure Act of 1946*

The *Attorney General's Manual on the Administrative Procedure Act* (APA, 1946) lists the first of four basic purposes of the APA as "to require agencies to keep the public informed of their organization, procedures and rules." The plaintiff contends that the NSF has failed to keep the public informed of the proposal review process in general, and review panels in particular.

9

NSF SBIR solicitations make no mention of review panels. The plaintiff searched the NSF website and found no more than passing references to the panel review process[§]. The plaintiff filed six proposals over five years and never heard about the review panels until he'd asked Dr. Mehta and other NSF staff repeatedly over more than six months about the review process.

The second basic purpose of the APA is "to provide for public participation in the rulemaking process, for instance through public commenting." The NSF has a system of advisory committees[**] that "relies on the judgement of external experts to provide advice and recommendations on its programs." The committees are mandated to oversee, for example, astronomy and astrophysics, biological sciences, etc. No committee is mandated to oversee the proposal review process. It is not explained how these "external experts" are selected. The plaintiff contends that the NSF lacks public participation in rulemaking for the proposal review process.

The third basic purpose of the APA is "to establish uniform standards for the conduct of formal rulemaking and adjudication." The proposal review process appears to lack written rules, particularly regarding the formation and use of review panels.

The fourth basic purpose of the APA is "to define the scope of judicial review." 5 U.S.C. 551(1) defines the scope of judicial review as every agency or authority of the Government of the United States except Congress, federal courts, governments of territories or possessions of the United States, and the U.S. president. The plaintiff contends that the NSF is an agency or authority of the Government of the United States, is not in the list of exceptions, and is therefore subject to judicial review.

***Standard of Judicial Review***

The APA requires under 5 U.S.C. § 706(2)(A) that to set aside agency actions the court must conclude that the agency action was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law."

The plaintiff contends that the selection of reviewers of his proposals was arbitrary and

---

[§] For example, see "Phase II: Proposal Review and Processing,"
https://www.nsf.gov/bfa/dias/policy/merit_review/phase2.jsp#select
[**] https://new.nsf.gov/about/advisory-committees

10

capricious.

The plaintiff further contends that the reviewers should have refused to review a proposal that they lacked expertise to review, but instead these reviewers abused their discretion when they chose to review the plaintiff's proposals.

The plaintiff further contends that his proposals were not reviewed in accordance with NSF solicitations and policies, which carry the weight of law. NSF policy states, regarding solicitations, that, "Adherence to these requirements is strictly enforced…"[††]

"Arbitrary and capricious review allows agency decisions to stand as long as an agency can give a reasonable explanation for its decision based on the information that it had at the time."[‡‡] The plaintiff's discussions with Dr. Mehta found that NSF staff was aware that, when experts in the particular fields of a proposal could not be found in the NSF's database of reviewers, falling back to subtopic experts resulted in reviewers with "conversational knowledge" of the fields of proposals (to use Dr. Mehta's words) rather than particular expertise.

Moving from the systemic to the particular, program directors were always cognizant of the expertise, or lack thereof, of the review panel members assigned to the plaintiff's proposals. The job a program director is to know the expertise of reviewers and the fields of proposals. All of these proposals included suggested reviewers with expertise in the particular fields of the proposals.

Furthermore, in January 2023 the plaintiff began questioning NSF staff regarding the expertise of the reviewers of his proposals. NSF staff, including program directors, were aware that their choice of reviewers was questionable before the plaintiff filed proposals 2322005 (March 2023) and 2334482 (July 2023). These latter proposals included lengthy, detailed Suggested Reviewer sections which included federal agencies, an academic organization, and potential customers. The program directors, who were aware of the weaknesses of their review panels process, had sufficient information to find qualified reviewers outside of the NSF.

---

[††] "Phase II: Proposal Review and Processing," https://www.nsf.gov/bfa/dias/policy/merit_review/phase2.jsp#select

[‡‡] Wikipedia, "Administrative Procedure Act," referring to Watson, Theodore (2015-02-18). "Arbitrary and Capricious Meaning Definition :: Legal Standard for Challenging Agency Actions". Watson & Associates LLC Government Contracts Blog.

11

### *Chevron Deference*

While the APA concerns how government agencies create rules, the Chevron deference[§§] concerns how government agencies may interpret their own rules. This doctrine allows government agencies wide room for interpreting their own rules.

It is imaginable that the NSF might, under the Chevron deference, interpret "experts in the particular fields represented by the proposal" to include reviewers who have "conversational knowledge" of a field instead of expertise, or who have expertise in other fields included in the same subtopic.

The plaintiff contends instead that Chevron deference doesn't allow government agencies to ignore their own rules. NSF solicitations and policies clearly state *special* knowledge and *particular* fields. In other words, "conversational knowledge" doesn't count. Fields related only by a subtopic don't count. This isn't horseshoes.

### *Similarity to Employment Law*

The plaintiff contends that this complaint bears similarity to employment law.

- A government agency that offers grants is like an employer that posts job openings.
- A grant applicant who submits a proposal is like a job applicant who completes an employment application.
- A grant provider is expected to follow its own rules and applicable laws when evaluating proposals, like an employer is expected to follow employment laws.
- A grant applicant who has been rejected and who discovers evidence that their rejection was not in compliance with applicable rules or laws can sue a government agency, like a rejected job applicant can sue an employer if they have similar evidence.
- The loss of a potential grant is damage caused by a government agency, like a job applicant's loss of potential income is damage caused by the employer.

While the defendant is not obligated to fund any proposal, the plaintiff contends that the defendant is obligated to comply with its own rules and applicable laws when deciding

---

[§§] Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). *The New York Times* suggested that the Supreme Court may end the Chevron deference. "The Justices Return," October 3, 2023, https://www.nytimes.com/2023/10/03/briefing/supreme-court-cfpb-chevron.html

12

whether to fund proposals and is liable for the value of the grant when evidence is found of non-compliance.

***Harm Caused by Defendant***

The alleged NSF staff misconduct and non-compliance with solicitations and policies resulted in non-funding of five proposals (total value: $1,286,548), expenses for grant writing consultants ($2,620), delays in the plaintiff's career, and missed advancements in the field of second language acquisition.

The plaintiff started coding this project in 2017. Two years later a "proof of concept" app was ready to show. The plaintiff then decided between talking to investors vs. seeking grants. These options are mutually exclusive at certain times when starting a business. The plaintiff chose the path of applying for federal grants because the project appeared to be a good fit with the NSF SBIR program. This "good fit" was repeatedly confirmed by Dr. Mehta and other program directors as a "Project Pitch" must be approved by a program director prior to submitting a proposal.

The plaintiff's first proposal (1938503, 2019) received only an average score of 1.33/4 but for the next proposal the plaintiff worked with a grant-writing consultant provided free by the local Small Business Development Council. This proposal (2026081, 2020) doubled the average score (2.67/4), suggesting that the project was on a trajectory to funding (the NSF funds one in three SBIR proposals).

For the third proposal (2127082, 2021), the plaintiff paid a SBIR grant writing consultant. In August 2022 a program director called the plaintiff and said that the proposal was about to be funded and sent paperwork for receiving the funds. In December 2022 this proposal was declined.

For the fourth proposal (2223138, 2022) the plaintiff again paid the grant-writing consultant. When the reviews came back with an average score of 1.33/4 the plaintiff realized that what had appeared to be a trend of upward scores was in fact random. The plaintiff began questioning NSF staff.

The fifth proposal (2322005, 2023) had an expanded and improved "Suggested Reviewers" section, so that a program director could easily find qualified reviewers. This proposal came back with an average score of 1.67/4, again well below the scores of the

second and third proposals.

A sixth proposal (2334482, 2023) is pending.

NSF solicitations and policies led the plaintiff into believing that his proposals were likely to be funded and prevented the plaintiff from seeking private investors. If NSF staff had told the plaintiff that the review process is not compliant with solicitations and policies, that their database had no reviewers qualified to review his proposals, that they would not utilize suggested reviewers, and, consequently, there was no chance that his proposals would be funded, the plaintiff would have chosen to work with investors and at this point would have a successful startup likely valued at millions of dollars.

**E. REQUEST FOR RELIEF**

The plaintiff has a two-phase request.

In the first or evidence phase, the plaintiff requests a court order to the defendant to release to the plaintiff a report of the reviewers' expertise for proposals 1938503, 2026081, 2127082, 2223138, and 2322005:

- Each reviewer's education, affiliation, and other special knowledge or particular expertise, plus contact information to verify veracity.
- The "comfort level" of expertise each reviewer reported when reviewing the above proposals.
- The keywords used to constitute the panels that reviewed the above proposals.

The plaintiff requests the same information regarding proposal 2334482, currently pending, if it has been declined by the time this complaint reaches the court, and any other proposals submitted at future dates, if they have been declined by the time this complaint reaches the court.

This report should take less than two hours to produce. It's just clicking in a database. In the interest of a speedy trial, the plaintiff suggests that the defendant bring this report to the court.

The plaintiff requests this court order under 5 U.S.C. § 552a(b)(11):

> *"No agency shall disclose any record which is contained in a system of records…except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains [such as a reviewer of*

14

> *NSF proposals], unless the disclosure would be…(11) pursuant to the order of a court of competent jurisdiction."*

In the second or compensation phase, if the court grants the above order, and the defendant provides the information, and the disclosed information is discovered to be evidential that reviewers lacked expertise in the particular fields of the proposals, the plaintiff requests that the court order the defendant to compensate the plaintiff for the value of the above proposals ($1,286,548), plus expenses ($2,620), interest, and other costs.

The plaintiff requests similar compensation for proposal 2334482 ($275,000), currently pending, and any other proposals submitted at future dates, if they have been declined by the time this complaint reaches the court.

## F. PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct.  See 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

*Thomas David Kehoe*

2023 October 13

**APPENDIX #1: SPECIFIC REVIEWS**

The following reviews show deficiencies in expertise in the particular fields of the proposals.

- 1938503 (2019) #1, *Fair*, "Spot the mystery rule," "TLDR."
- 2127082 (2021) #3, *Good*, "Spot the mystery rule."
- 2223138 (2022) #1, *Very Good*, "Special ignorance of the science and engineering subfields."
- 2223138 (2022) #2, *Poor*, "TLDR."
- 2223138 (2022) #3, *Fair*, "TLDR."
- 2322005 (March 2023) #1, *Fair*, "Expertise expired."
- 2322005 (March 2023) #2, *Fair*, "Special ignorance of the science and engineering subfields."

**APPENDIX #2: LIST OF PROPOSALS AND SCORES**

1938503 (submitted 06/03/2019, declined 10/18/2019): Very Good, ***Fair***, Poor (average: 1.33/4)

2026081 (submitted 03/05/2020, declined 01/11/2021): Very Good, Very Good, Good (average: 2.67/4)

2127082 (submitted 03/04/2021, declined 11/08/2021): Very Good, Good, ***Good*** (average: 2.33/4)

2223138 (submitted 03/03/2022, declined 12/09/2022): ***Very Good***, ***Fair***, ***Poor*** (average: 1.33/4)

2322005 (submitted 03/01/2023, declined 06/13/2023): Very Good, ***Fair***, ***Fair*** (average: 1.67/4)

2334482 (submitted 06/27/2023): pending

***Bold italic*** reviews suggest lack of expertise in the particular fields of the proposals.